NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

*Corrected June 2, 2009

2008-1482

PURECHOICE, INC.,

Plaintiff-Appellant,

v.

HONEYWELL INTERNATIONAL, INC.,

Defendant-Appellee.

Donald W. Rupert, Marshall, Gerstein & Borun LLP, of Chicago, Illinois, argued for plaintiff-appellant.  With him on the brief were Bradford P. Lyerla, Thomas L. Duston, and Margaret L. Begalle.

M. Miller Baker, McDermott Will & Emery LLP, of Washington, DC, argued for defendant-appellee.  With him on the brief was David M. Stein, of Irvine, California.

Appealed from:  United States District Court for the Eastern District of Texas

Judge T. John Ward

* Corrected spelling of attorney name

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-1482

PURECHOICE, INC.,

Plaintiff-Appellant,

v.

HONEYWELL INTERNATIONAL, INC.,

Defendant-Appellee.

Appeal from the United States District Court for the Eastern District of Texas in case no. 2:06-CV-00244, Judge T. John Ward.

_____

DECIDED: June 1, 2009

_____

Before MAYER, GAJARSA, and LINN, Circuit Judges.

PER CURIAM.

PureChoice, Inc. appeals the judgment of the United States District Court for the Eastern District of Texas which found several claims of U.S. Patent No. RE38,985 invalid under the 35 U.S.C. § 112 definiteness requirement because two claim terms present in each claim could not be construed. PureChoice, Inc. v. Honeywell Int'l Inc., No. 2:06-cv-00244 (E.D. Tex. Mar. 14, 2008). PureChoice also appeals the construction of "air quality" present in these claims, upon which the district court relied

to find indefiniteness. Because we agree that "air quality" was properly construed and that the two dependent limitations are unable to be construed, we affirm.

BACKGROUND

PureChoice is the owner of the RE38,985 patent ("'985 patent") entitled "Environment Monitoring System" which is a reissue of U.S. Patent No. 5,892,690 ("'690 patent"). The patent discloses a system and method for acquiring and monitoring certain types of air and water quality data, including a set of sensors and data storage devices coupled to the sensors. In 2006, PureChoice merged an ex parte reexamination request of the '690 patent with its own reissue request to amend independent claims 1 and 16, and add claims 21 through 76. The '985 patent followed, and Claim 1 is representative:

> 1. An air quality monitoring system comprising:
> a data acquisition system for collecting air quality data at a data acquisition site, said data acquisition system including:
> at least one sensor for measuring environmental air quality data;
> a second plurality air quality sensor adapted to measure non-weather data;
> a data storage device coupled to the sensor for storing data measured by the sensor;
> a remote access device coupled to the data storage device for electronically accessing measured data stored on the data storage device from a remote system;
> a remote database for storing air quality data from a plurality of data acquisition systems;
> a remote access device coupled to the remote database for electronically accessing the remote database for uploading and storing measured data from data acquisition sites; and
> means for systematically and automatically uploading data from acquisition sites to the remote database.

The original claim comprised at least one sensor for measuring air quality data, coupled to a data storage device and a remote access device. During reexamination, PureChoice amended claim 1 to add that the air quality data measured by at least one

sensor would be "environmental air quality data," and the limitation of a second plurality of air quality sensors to measure "non-weather data." The specification does not, however, define either environmental air quality or non-weather data.

PureChoice asserted claims 1, 16, 21, and 62 against Honeywell monitoring systems, including their Enterprise Building Integrator and ComfortPoint systems and others. Honeywell defended by arguing that its systems did not infringe, and that the '985 patent was invalid for indefiniteness.

The district court held a hearing to construe the terms of the '985 patent. PureChoice argued that the term "air quality" as mentioned in each asserted claim should be read broadly and construed simply as "the quality of the air." Honeywell, on the other hand, argued that because the claims, the specification, the prosecution history, and extrinsic evidence suggested that the invention only addressed particulates in the air, "air quality" should be construed only as "the concentration of pollutants or contamina[nts] in the air." It specifically excluded "meteorological, climate, or comfort related variables, such as temperature and humidity." PureChoice also argued constructions for two other terms, "sensor for measuring environmental air quality data" and its homologue, and "air quality sensor adapted to measure non-weather data." It argued that the sensor for measuring limitation should be construed as a "sensor for measuring quantitative information regarding an air quality of the environment in the data acquisition site." It argued that "air quality sensor adapted to measure non-weather data" means an "air quality sensor adapted to measure quantitatively an air property in the controlled environment of a type not normally identified with weather (e.g. not temperature or humidity)."

Honeywell responded that both terms were indefinite under 35 U.S.C. § 112 based on its argument that air quality excludes meteorological variables. It also rebutted PureChoice's proposed constructions, arguing that they were so vague and ambiguous as to require constructions that would reclaim in reexamination that which PureChoice surrendered in its initial prosecution.

The district court largely agreed with Honeywell and held that "air quality" means the "concentration of pollutants or contamina[nts] in the air." The court then agreed with Honeywell that it is impossible to construe or differentiate "sensor for measuring environmental air quality data" and "air quality sensor adapted to measure non-weather data," and thus held that these terms were indefinite. PureChoice timely appealed the constructions. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

DISCUSSION

Claim construction is a question of law that we review de novo. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454-55 (Fed. Cir. 1998). Claim indefiniteness is also a question of law that we review de novo. Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc., 336 F.3d 1308, 1318 (Fed. Cir. 2003).

We first address the proper construction of air quality and start with the specification. "The specification is the single best guide to the meaning of a disputed term," and we read the claim terms in view of the specification. Phillips v. AWH Corp., 415 F.3d 1308, 1321 (Fed. Cir. 2005) (internal quotations removed).

PureChoice argues that the term should be construed as its plain meaning, "the quality of the air." This definition however does not inform the public what qualities the invention is concerned with, and is overbroad. The specification never mentions

sensing temperature, humidity or other meteorological attributes of the air. However, it does discuss sensing contaminants and pollutants extensively throughout. For instance, at column 4 lines 38 through 40, the specification discusses examples of "smoke or particle sensors, volatile organic compound sensors, [and] carbon monoxide sensors" but does not include any meteorological sensing. Mindful not to impute an attribute of a preferred embodiment into a claim term, see Electro Med. Sys., S.A. v. Cooper Life Sci., Inc., 34 F.3d 1048, 1054 (Fed. Cir. 1994), preferred embodiments nevertheless are evidence of its meaning. In the '985 patent, the preferred embodiment also does not disclose any meteorological sensing, but rather "employs a particle sensor and a volatile organic compound sensor." '985 patent col. 4 ll. 40-41. Indeed among the listed "various sensors 14a-n" that may be employed for testing air quality attributes, all sense particles or contaminants: other sensors that can produce an electrical signal proportional to the amount of foreign substances, toxins or other chemicals, and ionizing smoke or particle detectors. Id. col. 4 ll. 40-60.

Other evidence in the specification also suggests to persons having ordinary skill that the relevant attributes comprising air quality are contaminants and particles only. While PureChoice argues that air quality should be read broadly because the specification speaks to attributes that affect the health and well-being of a population, the surrounding text in the specification deals with particles and contaminants as the attributes of air quality that adversely affect health and well-being:

> Certain environments are more susceptible to pollutants that negatively effect [sic] air quality, such as a bar, restaurant, nightclub or casino where a high percentage of people smoke. Other environments require a consistent and predetermined air quality, which is free from pollutants, toxins and chemicals, such as hospitals, nursing homes, pharmaceutical

> manufacturing facilities or other manufacturing facilities that require "clean rooms."

Id. col. 1 ll. 20-28 (emphasis added). The specification clearly shows that the invention is concerned with contaminants and pollutants, and not meteorological attributes.

The lack of any suggestion of meteorological attributes in air quality in the specification and the many mentions at various points of contaminants and particles is enough to conclude that the claimed invention is narrower than the claim language might imply, making it proper to limit the claims. See Alloc, Inc. v. Int'l Trade Comm'n., 342 F.3d 1361, 1370 (Fed. Cir. 2003). However, further buttressing the construction is PureChoice's disavowal of the inclusion of meteorological attributes in air quality during prosecution. To overcome a rejection in light of a Gilbert reference that disclosed a system comprising sensors that monitor temperature and sensors that measure pollution, PureChoice amended its claims, replacing the term "measuring environment data" to "measuring air quality data." This amendment is the source of the "air quality" term, which PureChoice argued was distinguishable over Gilbert because it was related to measuring specific pollutants. In particular, PureChoice told the examiner,

> Applicants' invention relates to measuring air quality, and . . . discloses use of such sensors as smoke sensors, particle sensors, volatile organic compound sensors, or carbon monoxide sensors for collecting and monitoring air quality. Such sensors produce an electronic signal proportional to the presence of foreign substances. The electronic signal is converted to an air quality measurement, such as particles per cubic meters [sic] of air.

In other words, Gilbert disclosed measuring meteorological attributes, and the application that became the '985 patent disclosed sensing particles. PureChoice argues that this is not a clear and unmistakable disavowal of meteorological attributes because, while Gilbert collected environmental data, PureChoice amended the claims to

expressly limit the sensors to the collection of air quality data. This is unpersuasive, however, because the response makes clear that the difference between environmental data, as the examiner stated was present in Gilbert, and air quality data, is the contaminant and particle data mentioned in the passage above. Therefore, PureChoice has clearly and unmistakably disavowed environmental data insofar as it extends beyond contaminants and particles.

PureChoice points out that temperature was mentioned as an attribute the invention senses during prosecution, when it stated to the examiner that "the digital [air quality] value [reported by a sensor] must be put into the context of what is being sensed (for example, smoke level, CO level, temperature)." We are, however, unconvinced that the scant appearance of meteorological attributes in the hundreds of pages of specification and prosecution history would inform a person of ordinary skill that air quality extends beyond contaminants and pollutants, when weighed against references to the latter attributes found throughout the specification and prosecution history. Therefore, we affirm the construction of "air quality."

With the construction of air quality fixed, we look to whether the two remaining terms in dispute are indefinite under 35 U.S.C. § 112, paragraph 2. A claim satisfies the definiteness requirement "[i]f one skilled in the art would understand the bounds of the claim when read in light of the specification." Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001). A claim will be found indefinite only if it "is insolubly ambiguous, and no narrowing construction can properly be adopted." Id.

As observed above, environmental data was disavowed during prosecution insofar as it extended beyond air quality data as construed. When the patent originally

issued as the '690 patent, these two claim terms were a single term: "sensor for measuring air quality data." During reexamination, the term was split into a "sensor for measuring *environmental* air quality data" and "air quality sensor adapted to measure non-weather data." Because PureChoice did not reduce the interviews that resulted in the amended claim terms to writing pursuant to 37 C.F.R § 1.560(b), and because neither "environmental air quality" nor "non-weather data" appears in the written description, the court is left without a record to explain the difference or relationship between the two terms that provoked allowance. Applying the construction of air quality to the terms, the first becomes a sensor for measuring a concentration of environmental pollutants or contaminants in the air, but not meteorological data, while the second becomes a sensor for measuring a concentration of pollutants or contaminants, but not meteorological data, adapted to measure non-weather data. Not only are these two terms identical in meaning, but they are insolubly ambiguous. An air quality attribute cannot simultaneously be environmental, understood during prosecution as including weather attributes such as temperature and humidity, yet limited to non-meteorological attributes.

Furthermore, the claim cannot be read on the preferred embodiment, described as employing "a particle sensor and a volatile organic compound sensor." '985 patent at col. 4 ll. 41-42. Because the claim clearly requires at least one of each type of environmental air quality sensors and non-weather air quality sensors, the particle sensor and the volatile organic compound sensor must be of different types. However, the specification does not describe which sensor is which. PureChoice argues that the two types of claimed sensors can cover both the particle sensor and the volatile organic

compound sensor, but this is clearly forbidden as the examiner clearly stated allowable subject matter requires "a second plurality of sensor[s] adapted to measure different air quality attributes than the first air quality sensor." The terms are indefinite. We affirm the district court's finding thus the asserted claims are invalid.

## CONCLUSION

Accordingly, the judgment of the United States District Court for the Eastern District of Texas is affirmed.

## AFFIRMED