AQUATEX INDUSTRIES,
INC., Plaintiff,

v.

TECHNICHE SOLUTIONS, Defendant.

No. 3:02–0914.

United States District Court,
M.D. Tennessee,
Nashville Division.

Sept. 27, 2004.

Jack A. Wheat, Stites & Harbison, Louisville, KY, James R. Michels, Stites & Harbison, PLLC, Stephen H. Price, Stites & Harbison, PLLC, Nashville, TN, Joel T. Beres, Stites & Harbison, Louisville, KY, for AquaTex Industries, Inc., Plaintiff.

James Alfred DeLanis, Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, John Randolph Bibb, Jr., Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, Nashville, TN, Thomas D. Foster, David R. Preston & Associates, APC, San Diego, CA, for TechNiche Solutions, Defendant.

## MEMORANDUM

ECHOLS, District Judge.

Presently pending before the Court are the following motions: (1) Defendant's Motion for Summary Judgment (Docket Entry No. 43); (2) Plaintiff's Cross–Motion For Partial Summary Judgment Re Patent Infringement Liability (Docket Entry No. 47); and (3) Plaintiff's Motion for Sanctions (Docket Entry No. 50). The parties have responded in opposition to the Motions.

## I. PROCEDURAL HISTORY

Plaintiff AquaTex Industries, Inc., an Alabama corporation, initiated the present action under 35 U.S.C. § 271(c) against Defendant TechNiche Solutions, a California corporation, alleging a claim of contributory infringement of U.S. Patent No. 6,371,977 (the "'977 patent"). Plaintiff contends Defendant's evaporative cooling garments and products infringe Plaintiff's '977 patent literally or through application of the doctrine of equivalents. Plaintiff seeks permanent injunctive relief, both compensatory and treble damages, attorney's fees, and both pre- and post-judgment interest to remedy Defendant's alleged contributory infringement. Defendant denies the claim and seeks judgment in its favor, along with an award of attorney's fees.

The Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). Defendant expressly waived its right to contest venue. (Docket Entry No. 17 ¶ 3.)

Defendant moves for summary judgment on the ground that its product does not infringe Plaintiff's '977 patent literally or by application of the doctrine of equivalents. Plaintiff moves for partial summary judgment on the issue of liability, contending Defendant's product does infringe its '977 patent.

For purposes of the summary judgment motions, the parties do not dispute they both market multi-layered, liquid-retaining composite material for evaporative cooling garments. This composite material includes an absorbent inner layer, and when soaked in water and worn, the garment creates an evaporative cooling effect for the wearer. There also is no dispute that both products contain hydrophilic polymer-

ic particles or fibers in the water-absorbent inner layer of the composite material.

The central issue in this case is whether Vizorb®, which is manufactured by Buckeye Technologies and used by Defendant in the absorbent layer of its product, constitutes "fiberfill" as used in Plaintiff's patented technology. The parties agree the word "fiberfill" is not expressly defined in the '977 patent. Resolution of this issue determines whether Defendant is liable for contributory infringement.

Defendant contends Vizorb® does not constitute "fiberfill" as the term is used in Plaintiff's '977 patent or as used by those persons of ordinary skill in the relevant art. According to Defendant, the ordinary and customary meaning of "fiberfill" is synthetic fiber, while Vizorb® is a fabric comprised primarily of natural wood pulp and super absorbent powder. Defendant asserts, moreover, that Vizorb® is a staple of commerce sold in bulk form to be used as an absorbent in a wide variety of products.

Plaintiff contends the term "fiberfill" carries a broad meaning in the art that encompasses both synthetic and natural fibers. In Plaintiff's view, Vizorb® constitutes "fiberfill" because it contains both natural and synthetic fibers.

Plaintiff has also filed a Motion for Sanctions, accusing Defendant of misrepresenting facts, manufacturing evidence, and refusing to withdraw its summary judgment motion after Plaintiff repeatedly asked Defendant to do so. Plaintiff suggests Defendant's alleged bad faith litigation conduct warrants the imposition of sanctions under Federal Rule of Civil Procedure 56(g) and the inherent power of the Court.

## II. FACTS

On April 16, 2002, the United States Patent and Trademark Office ("PTO") issued the '977 patent for Plaintiff's "Protective Multi–Layered Liquid Retaining Composite." The '977 patent is a continuation in part of previous applications by Plaintiff that resulted in Patent No. 5,885,912, issued March 23, 1999.

■ The '977 patent includes 35 claims.[1] Pertinent to this case are independent Claims 1 and 9. Claim 1 describes the water-absorbent layer of Plaintiff's composite as comprising *"a fiberfill batting material, and hydrophilic polymeric fibers* [.]" (Docket Entry No. 46 at 68, emphasis added). Claim 9 describes the water-absorbent layer as comprising *"a fiberfill batting material and hydrophilic polymeric particles[.] "* (*Id.* at 69, emphasis added.)

■ The specification[2] of the '977 patent describes "a filler layer impregnated [with] *a fiberfill batting material* and with liquid absorbent particles, fibers, or a combination of both[.]" (Docket Entry No. 46 at 63, emphasis added.) Further, the specification states:

With respect to the liquid absorbent fibers, the blend is a combination of a superabsorbent polymeric fiber and *fiberfill* or batting. *The particular fiberfill is not known to be critical. That is, any commercial fiberfill may be used so long as it does not adverse-*

1. The Claims of Plaintiff's '977 patent define the scope of the patent like the property description in a deed defines the boundaries of the property being conveyed.

2. The specification of the '977 patent explains how to make and use the invention and includes a written description of examples of the invention and technical drawings. Specific examples, referred to as "preferred embodiments" or "alternative embodiments" of how one may practice the invention, do not limit the scope of the Claims.

*ly affect the performance of the end composite.* Accordingly, when the end composite is to be used as or part of a fire retardant garment, the fiberfill or batting is chosen accordingly. In such a case, the fiberfill is typically comprised of a flame and heat resistant material such as woven aramid and/or polybenzamidazole ("PBI") fibers. That is, fiberfill is selected from a group consisting of an aramid polymer fabric material, as blend of aramid polymer fabric materials, a polybenzamidazole material, and a blend of aramid polymer fabric and polybenzamidazole materials. For other non-flame retardant applications, commercial fiberfill such as DuPont DACRON® available from DuPont, or polyester fiberfill products from Consolidated Textiles, Inc. of Charlotte, N.C. [sic] Additionally, U.S. Pat. Nos. 5,104,-725; 4,304,817; and 4,818,599;[3] all of which [are] incorporated by reference, disclose fiberfill fibers and blends suitable for certain applications of the present invention.

(Docket Entry No. 46 at 63, emphasis added.)[4]

During prosecution of the '977 patent, the examiner initially rejected Plaintiff's Claims 1 and 9[5] as already described or "anticipated" by Zafiroglu ('297 patent).

(Docket Entry No. 46 at 225.) The examiner observed:

As to claims 31 and 43, Zafiroglu [U.S. Patent No. 4,897,297] discloses a method of cooling a person, comprising:

providing multi-layered, liquid-retaining composite material comprising *a fiberfill batting material (mixture of synthetic polymer pulp or wood pulp, which is a fiber) and hydrophilic polymeric fibers or particles that absorb at least 2.5 times the fiber's or particle's weight (15–35 times);* soaking the multi-layered, liquid-retaining composite material in a liquid (water); and employing the same as a flat sheet (compress or the basis of a material to form an article such as a pillow, tube, quilt or the like . . .).

(Docket Entry No. 46 at 225, emphasis added.) The specification of the Zafiroglu patent states:

Depending on economics and anticipated number of uses, the diluent may include synthetic textile fibers, wood pulp fibers, cotton linters, and mixtures of fibers. . . . A preferred diluent is a mixture of wood pulp and polyethylene synthetic pulp[.]

(Docket Entry No. 53, Tab A at 3, column 4.)

**3.** Copies of these three patents are included in the summary judgment record at Docket Entry No. 46 at 70–91. Each patent involves synthetic polyester fiberfill or synthetic polyester fiberfill blends.

**4.** While Defendant also quotes an embodiment and an example from the '977 patent specification at pages 8–9 of its Memorandum, (Docket Entry No. 44), the Court does not rely on the quoted language in analyzing the case. As Plaintiff correctly points out, the Court may not limit the patent claims by reference to a preferred embodiment or specific example in the specification. *See Prima Tek II LLC v. Polypap,* 318 F.3d 1143, 1150–51 (Fed.Cir.2003); *Laitram Corp. v. Cam-*

*bridge Wire Cloth Co.,* 863 F.2d 855, 865 (Fed. Cir.1988); *Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 805 F.2d 1558, 1563 (Fed.Cir.1986).

**5.** Claim 1 was previously numbered Claim 31 in the "Preliminary Amendment" to the patent application. Claim 9 was previously numbered Claim 43 in the "Response To Restriction Requirement." Neither Claim 31 nor Claim 43 initially included the words "by evaporation," which Plaintiff added during the patent prosecution process to distinguish the '977 patent from the '297 Zafiroglu patent and to overcome the examiner's rejection. (Docket Entry No. 46 at 178 & 213.)

Plaintiff responded to the examiner's rejection by noting differences between Plaintiff's invention and the Zafirogou '297 patent:

The '297 Patent discloses *a compress that is made from an elastic fabric and comprises a hydrogel-forming polymeric material.* The absorbent polymer filler material may be particulate, and may be accompanied by a diluent filling material.

*However, the '297 Patent fails to disclose or suggest the fiberfill batting and polymeric fibers and/or particles of the composite material in the claimed method.* Additionally, the '297 Patent fails to disclose or suggest the evaporative cooling method of the present invention.... As noted in the Examples (at col. 6), the articles of '297 showed no evaporation after one hour, or insignificant evaporation after 8 hours. Furthermore, the samples are placed in a hot-air oven for 12 hours for drying to return the samples to their original weight.

(Docket Entry No. 46 at 245, emphasis added.)

Plaintiff amended Claims 31 and 43, now Claims 1 and 9, to specify cooling of a person "by evaporation." (Docket Entry No. 46 at 239.) Convinced by Plaintiff's "persuasive" arguments and amendments, the examiner withdrew the rejection and allowed issuance of the '977 patent. (Docket Entry No. 46 at 255–256.)

The product Defendant uses in its garments, Vizorb®, is an airlaid non-woven fabric predominantly made of cellulose fluffed pulp, but incorporating both natural and synthetic fibers. (Grosvenor Dep., Docket Entry No. 46 at 23, 45; Docket Entry No. 52, Exs. 12 & 14.) Vizorb® is manufactured from wood cellulose, superabsorbent polymer, bicomponent fiber, cellulose based carrier sheet, and a chemical binder. (Docket Entry No. 52, Tab 13.) It is not a tangled web of long fibers, as is synthetic "fiberfill". (Grosvenor Dep., Docket Entry No. 46 at 45.) Ordinarily, a Vizorb® fiber is very short, at approximately 3 millimeters in length, with the longest fiber approximately 6 millimeters in length. The product is glued together. (Grosvenor Dep., Docket Entry No. 46 at 36, 45.) The superabsorbent in Vizorb® is referred to as a powder, not a hydrophilic particle or crystal. (*Id.* at 37.)

Vizorb® is typically used in feminine hygiene products, baby diapers, and adult incontinence products. (Grosvenor Dep., Docket Entry No. 46 at 34.) It is not usually used to stuff furniture, pillows, or sleeping bags, and it is not considered batting material. (Grosvenor Dep., Docket Entry No. 46 at 35.)

### III. STANDARD OF REVIEW UNDER RULE 56

In ruling on a motion for summary judgment, this Court must construe the evidence produced in the light most favorable to the non-moving party, drawing all justifiable inferences in his or her favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party may obtain summary judgment if the evidentiary material on file shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.,* 318 F.3d 1143, 1147 (Fed.Cir.2003). The moving party bears the burden of satisfying the court that the standards of Rule 56 have been met. *Martin v. Kelley,* 803 F.2d 236, 239 n. 4 (6th Cir.1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact which is disputed. *Anderson,* 477 U.S. at 248, 106

S.Ct. 2505. If so, summary judgment dismissal is inappropriate.

To defeat a properly supported motion for summary judgment, an adverse party "must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R.Civ.P. 56(e). The non-moving party's burden of providing specific facts demonstrating that there remains a genuine issue for trial is triggered once the moving party "show[s]—that is, point[s] out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## IV. APPLICABLE LAW AND ANALYSIS

### A. Overview of Pertinent Patent Law Principles

"It has long been understood that a patent must describe the exact scope of an invention and its manufacture to 'secure to [the patentee] all to which he is entitled, [and] to apprise the public of what is still open to them.'" *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) (quoted case omitted). These objectives are served by two distinct elements of a patent document: the claims and the specification or written description. *Id.* The claims point out particularly and distinctly the subject matter which the patentee claims is his invention. *Id.* A claim covers and secures a process, a machine, a manufacture, a composition of matter, or a design, but not the function or result, or the scientific explanation of operation. *Id.* The claims forbid creation of exact copies of the invention and products that go to the "heart" of the invention but which avoid the literal language of the claim by making a noncritical change. *Id.* The specification describes the invention " 'in such full, clear, concise, and exact terms as to enable any person skilled in the art ... to make and use the same.'" *Id.* (quoting 35 U.S.C. § 112).

▮ To hold Defendant liable for contributory infringement, Plaintiff must show Defendant knew the intended use of its products would infringe Plaintiff's patent and that Vizorb®, a component of Defendant's products, does not have any substantial non-infringing uses. 35 U.S.C. § 271(c); *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1061 (Fed.Cir. 2004). There can be no contributory infringement absent direct infringement. *Novartis Pharmaceuticals Corp. v. Eon Labs Mfg., Inc.*, 363 F.3d 1306, 1308 (Fed. Cir.2004); *Metabolite Laboratories, Inc. v. Laboratory Corp. of Am. Holdings*, 370 F.3d 1354, 1364 (Fed.Cir.2004.)

▮ A two-step process drives the analysis of a claim of direct patent infringement. The Court first determines as a matter of law the scope of the patent claims. *See Markman*, 517 U.S. at 384, 388, 116 S.Ct. 1384; *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1368 (Fed.Cir. 2003); *Teleflex, Inc. v. Ficosa North Am. Corp.*, 299 F.3d 1313, 1323 (Fed.Cir.2002). "Claim interpretation, as a question of pure law, is amenable to summary judgment and disagreement over the meaning of a term within a claim does not necessarily create a genuine issue of material fact." *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed.Cir.1995).

In the second step of the analysis, the allegedly infringing device is compared to the patent claims to determine, as a matter of fact, whether all of the limitations of at least one claim are present, either literally or by a substantial equivalent, in the ac-

cused device. *Teleflex, Inc.*, 299 F.3d at 1323; *Southwall Technologies, Inc.*, 54 F.3d at 1575. A jury performs the second step if any genuine issue of material fact exists to be tried. *Id.*

**B. *Claim Construction is an Objective Process***

■ The claim construction analysis always begins with the words of the claim, *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996), for the language defines the bounds of claim scope. *Teleflex, Inc.*, 299 F.3d at 1324. The claim is comprised of the language the patentee chose to use to identify with particularity the subject matter of the invention. *Intellectual Property Dev., Inc. v. UA–Columbia Cablevision*, 336 F.3d 1308, 1314 (Fed. Cir.2003). The claim language places the public on notice of the patent's allowed claims. *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed.Cir. 2002). The words used in the claims are examined from the perspective of a person ordinarily skilled in the art. *Intellectual Property Dev., Inc.*, 336 F.3d at 1314.

■ When the meaning of a claim term is in dispute, the Court must discern its ordinary and customary meaning, and may do so by consulting the claims themselves and published resources. *Id.* Dictionaries, encyclopedias, and treatises are objective resources that serve as reliable sources of information on the established meanings of words. *Id.; Novartis Pharmaceuticals Corp.*, 363 F.3d at 1308. "Such references are unbiased reflections of common understanding not influenced by expert testimony or events subsequent to the fixing of the intrinsic record by the grant of the patent, not colored by the motives of the parties, and not inspired by litigation." *Texas Digital Sys., Inc.*, 308 F.3d at 1203.

■ The focus in construing disputed terms in claim language is the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean, not the subjective intent of the parties to the patent when they used a particular term. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 986 (Fed.Cir.1995), *aff'd* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). To comply with Federal Circuit procedure, the Court must consult the objective resources to determine the ordinary and customary meaning of a term before the Court may consult the patent's specification and prosecution history or any extrinsic evidence external to the patent, including expert opinion testimony. *Id.* at 1204; *Prima Tek II, L.L.C.*, 318 F.3d at 1148; *Vitronics Corp.*, 90 F.3d at 1583.

■ The Court applies a heavy presumption that a claim term carries its ordinary and customary meaning as viewed by one of ordinary skill in the art, and the Court applies such meaning in the absence of any express intent by the patentee to give a novel meaning to the claim term. *Teleflex, Inc.*, 299 F.3d at 1325. The words in the claims are interpreted in light of the intrinsic evidence of record, which includes the specification, drawings, and prosecution history, to identify which of any different possible dictionary meanings of a claim term at issue is most consistent with the use of the word by the inventor. *Texas Digital Sys., Inc.*, 308 F.3d at 1203. If more than one dictionary definition is consistent with the use of the word in the intrinsic record, the claim term may be construed to encompass all such consistent meanings. *Id.* Intrinsic evidence is "the most significant source of the legally operative meaning of disputed claim language[,]" *Vitronics Corp.*, 90 F.3d at 1582, because such evidence provides context and clarification about the meaning of a

claim term. *Teleflex, Inc.,* 299 F.3d at 1325.

■ In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such cases it is improper to rely on extrinsic evidence. *Vitronics Corp.,* 90 F.3d at 1583. The Court may review extrinsic evidence only if it is needed to assist the Court in "comprehending the technology in accordance with the understanding of skilled artisans and as necessary for actual claim construction." *Altiris, Inc.,* 318 F.3d at 1369; *Vitronics Corp.,* 90 F.3d at 1583. The Court is prohibited from relying on extrinsic evidence to vary or contradict the clear meaning of a claim term. *Id.* "Any other rule would be unfair to competitors who must be able to rely on the patent documents themselves, without consideration of expert opinion that then does not even exist, in ascertaining the scope of a patentee's right to exclude." *Southwall Technologies, Inc.,* 54 F.3d at 1578; *Vitronics Corp.,* 90 F.3d at 1583.

## B. *Dictionary Definitions Compel the Conclusion That "Fiberfill" Means Synthetic Fiber*

■ With these legal principles in mind, the Court turns, then, to the first step of the claim construction process. The parties provide a number of helpful definitions for the term "fiberfill" from a variety of objective sources. The *Dictionary of Composite Materials Technology* (1989) defines "fiberfill" as "[s]ynthetic fibers with a specified linear density, cut length, and crimp for use as a filling material." (Docket Entry No. 46 at 296.) *Resil's Textile Dictionary* similarly defines the term as "[v]irgin man-made fib[ers] especially engineered as to linear density, cut length, and crimp for use as a textile filling material." (*Id.* at 298.)

*The Dictionary of Fabric Terms* states "fiberfill" is "[s]pecially engineered manufactured fibers, which are used as filler material in pillows, mattresses, mattress pads, sleeping bags, comforters, quilts, and outerwear." (*Id.* at 300, 362.) The *American Heritage® Dictionary of the English Language* (4th ed.2000), defines "fiberfill" as "[l]ightweight synthetic fiber used as filling or insulation, as in comforters, pillows, and outerwear." (*Id.* at 301, 302.) *Encarta® World English Dictionary, North American Edition* defines "fiberfill" as "synthetic material used for stuffing or insulation, for example, in cushions, comforters, or clothing[.]" (*Id.* at 303.)

*Random House Collegiate Dictionary* defines "fiberfill" as "synthetic fibers, as polyester, used as a filling or (sic) insulating cushions, comforters, winter garments, etc." (*Id.* at 304.) The *Random House Dictionary of the English Language* (2d ed., unabridged, 1987) gives the same definition and adds a notation suggesting the words "fiber" and "fill" were added together to make a new word sometime between 1960 and 1965. (*Id.* at 307.) Internet dictionary services, such as Infoplease and Fact Monster provide the same definition. (*Id.* at 308, 309.) *Merriam–Webster Dictionary* (online) also defines "fiberfill" as "synthetic fibers used as a filling material (as for cushions)." (*Id.* at 310.)

The *DuPont Sleep Products Glossary* (online) defines "fiberfill" as "filling for sleep products consisting of manmade polyester fibers; available in different types for different properties." (Docket Entry No. 46 at 341, 343.)

The United States International Trade Commission recognizes that polyester staple fiber, "a synthetic fiber similar in appearance to cotton or wool fiber when baled" is "known in the industry as 'fiber for fill,' as it is primarily used as polyester fiberfill." (*Id.* at 311.) The Commission

notes the "subject fiber is distinguished from other staple fiber by its diameter, 3 denier or more; length, 1 to 5 inches; and in some cases by the finish and the 'crimp' of the fiber." (*Id.*) The United States Customs Service lists "fiberfill" as a "Fiber Trade Name," for the generic term, "polyester." (*Id.* at 325.)

The online glossary at rtwear.com suggests the term "fiberfill" may be used as a generic term "for all stuffing fibers or materials used in battings, quiltings, sleeping bags, pillows etc." (Docket Entry No. 52, Ex. 9.) *Hawley's Chemical Dictionary* defines "fiberfill" as a "fiber designed specifically for use as a filling material in such products as pillows, comforters, quilted linings, furniture battings, e.g., sisal, jute." (Docket Entry No. 52, Ex. 7.) Sisal and jute are natural fibers derived from plants.[6] (Batra Dep., Docket Entry No. 52, Ex. 16 at 37.)

The American Textile Manufacturers Institute defines "fiberfill" as a "filling specially prepared for use in pillows, comforters and furniture upholstery. Most fiberfill produced today is made of polyester. Polyester is used predominantly for fiberfill since it retains its loft longer and better than natural fibers." (Docket Entry No. 52, Ex. 11.)

All but two of the objective definitions listed above classify "fiberfill" as synthetic fiber. While the parties disagree which of these definitions should be applied, a dispute over the ordinary and customary meaning of a term does not imply that such a meaning does not exist. *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1365 (Fed. Cir.1999).

The Court concludes as a matter of law that the ordinary and customary meaning of "fiberfill," as viewed by a person of ordinary skill in the art, is synthetic or man-made fiber, most commonly polyester, that has a specified linear density, cut length, and crimp making it ideal for use as a filling material in various products.

That the term "fiberfill" may also be used colloquially to include filling material comprised in whole or in part of natural fiber does not change the Court's legal conclusion. The broader, colloquial definition of "fiberfill" is not consistent with the intrinsic record of this case, as discussed more fully below. *See Teleflex Inc.*, 299 F.3d at 1325; *Vitronics Corp.*, 90 F.3d at 1582.

## C. *The Intrinsic Evidence Confirms the Ordinary Meaning of "Fiberfill" is Synthetic Fiber*

Once the Court has arrived at the ordinary and customary meaning of a claim term, the Court must examine the specification of the patent to decide if the patentee rebutted the ordinary and customary meaning. *Intellectual Property Dev., Inc.*, 336 F.3d at 1316; *Texas Digital Sys., Inc.*, 308 F.3d at 1204. "The presumption will be rebutted where the patentee, acting as his or her own lexicographer, has clearly set forth a definition of a claim term that is different from the term's ordinary and customary meaning." *Intellectual Property Dev., Inc.*, 336 F.3d at 1316. The presumption is also rebutted if, during patent prosecution process, the inventor disavowed or disclaimed the scope of the claim coverage by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope. *Id.* Notwithstanding the fact the

---

6. According to Dr. Subhash K. Batra, Defendant's expert, the *Hawley's* definition is similar to what Dr. Batra calls the "colloquial definition" of "fiberfill." Dr. Batra also testified coconut husk produces a fiber called "coir" which is used as a cushioning material. (Batra Dep., Docket Entry No. 52, Ex. 16, pages 37–38.) (*Id.*)

claims must be read in view of the specification, the Court may not read limitations from the specification into the claims. *Prima Tek II, L.L.C.,* 318 F.3d at 1148.

The intrinsic evidence in this case does not rebut the heavy presumption that the ordinary and customary meaning of "fiberfill." is synthetic fiber. *See Texas Digital Sys., Inc.,* 308 F.3d at 1203. The '977 patent specification and drawings do not define "fiberfill," nor do they disclose any express intent of the patentee to give the word "fiberfill" a novel meaning, including the colloquial meaning of the term. *See Teleflex, Inc.,* 299 F.3d at 1325.

To the contrary, the specification in the '977 patent states that "commercial fiberfill" may be used in the embodiments of the invention. As supported by the dictionary definitions listed above, those persons of ordinary skill in the art would assume, if not know, that "commercial fiberfill" refers to synthetic fiber. This seems especially true in light of the specification in the '977 patent which emphasizes that certain forms of synthetic "fiberfill" used in the garments will provide higher protection from the extreme temperatures of fire or from physical impacts than will other forms of synthetic fiberfill.

**D. *The Patent Prosecution History Confirms the Ordinary Meaning of "Fiberfill" is Synthetic Fiber***

Having examined the specification, the Court must perform the same exercise with regard to the patent prosecution history. *Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336, 1343 (Fed.Cir.2001). The prosecution history must be applied to exclude any interpretation of a claim the patentee may have disclaimed or disavowed during prosecution to obtain the patent. *Teleflex, Inc.,* 299 F.3d at 1326.

The '977 patent prosecution history confirms the Court's analysis that "fiberfill" means synthetic fiber. The patent examiner initially rejected Claims 1 and 9 of the '977 patent as anticipated by the Zafirogou '297 patent. The Zafirogou patent specified fiberfill batting material made of a mixture of synthetic polymer pulp or wood pulp.

In response to the examiner's rejection and to obtain the '977 patent, Plaintiff distinguished the Zafirogou '297 patent on the ground that it failed to "disclose or suggest the fiberfill batting and polymeric fibers and/or particles of the composite material in the claimed method." Also, Plaintiff contended the '297 patent disclosed "a compress that is made from an elastic fabric and comprises a hydrogel-forming polymeric material. The absorbent polymer filler material may be particulate, and may be accompanied by a diluent filling material." Persuaded by Plaintiff's remarks, the patent examiner withdrew the rejection and allowed the Claims of Plaintiff's '977 patent.

Plaintiff now insists that Vizorb®, the product Defendant uses in the absorptive layer of its evaporative cooling garments, is manufactured from a mixture of natural wood cellulose and synthetic fibers. Yet, Plaintiff seeks to hold Defendant liable for contributory infringement despite Plaintiff's earlier successful action in disavowing or disclaiming similar aspects of the Zafirogou patent. "Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." *Southwall Technologies, Inc.,* 54 F.3d at 1576. The patent prosecution history confirms the Court's legal construction of the term "fiberfill" as a synthetic fiber.

Because the Court is able to construe the claims as a matter of law by observing the ordinary and customary meaning of the term "fiberfill," as confirmed by the

intrinsic evidence of record, the Court cannot, and will not, consider the extrinsic expert and lay opinion testimony submitted in depositions and affidavits. *See Northern Telecom, Ltd. v. Samsung Elec. Co.,* 215 F.3d 1281, 1288 (Fed.Cir.2000) ("The use of extrinsic evidence to construe the scope of a claim is improper where the ordinary and accustomed meaning of a claim term does not render the scope of the claim unclear and where the patentee has not chosen to be his own lexicographer."); *Markman,* 52 F.3d at 983 (noting conflicting views of experts do not create genuine issues of material fact and cannot bind court or relieve court of its obligation to construe claims according to tenor of patent), *aff'd* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

■ The Court then proceeds to the second step of the infringement analysis by comparing the patent claims to Defendant's allegedly infringing products. *See Teleflex, Inc.,* 299 F.3d at 1323; *Southwall Technologies, Inc.,* 54 F.3d at 1575. Because the Court has concluded as a matter of law that the Vizorb® used in Defendant's cooling garments and products does not constitute "fiberfill" as the term is used in Plaintiff's '977 patent, Plaintiff is unable to establish that all of the limitations of at least one claim of the '977 patent are present literally in Defendant's accused garments. *See Teleflex, Inc.,* 299 F.3d at 1323; *Southwall Technologies, Inc.,* 54 F.3d at 1575. Where there is no direct infringement, Defendant cannot be held liable for contributory infringement. *See Metabolite Laboratories, Inc.,* 370 F.3d at 1364. Furthermore, the evidence shows, and Plaintiff does not dispute, that Vizorb® has substantial noninfringing uses. *See* 35 U.S.C. § 271(c); *Golden Blount, Inc.,* 365 F.3d at 1061. Thus, Defendant is entitled to summary judgment on the claim of literal contributory in-fringement. *See Novartis Pharmaceuticals Corp.,* 363 F.3d at 1308; *Metabolite Laboratories, Inc.,* 370 F.3d at 1364; *Golden Blount, Inc.,* 365 F.3d at 1061.

### E. *Plaintiff Cannot Prevail by Asserting the Doctrine of Equivalents*

Plaintiff contends alternatively, however, that it may establish a claim of contributory infringement against Defendant under the doctrine of equivalents because every equivalent of the asserted claim may be found in Defendant's cooling garments or products, Defendant's garments differ only unsubstantially from Plaintiff's literal claims, and Defendant's garments and products perform substantially the same function as Plaintiff's in substantially the same way to achieve substantially the same result. *See Wright Med. Technology, Inc. v. Osteonics Corp.,* 122 F.3d 1440, 1444 (Fed.Cir.1997).

■ The doctrine of equivalents was first enunciated by the Supreme Court in *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). "Under this doctrine, a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner–Jenkinson Co. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 21, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). Each element of a patent claim is deemed material to defining the scope of the patented invention. *Id.* at 29, 117 S.Ct. 1040. Thus, "the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." *Id.* The application of the doctrine of equivalents, even as to a specific element, is not allowed "such broad play as to effectively eliminate that element in its

entirety." *Id.; K–2 Corp.,* 191 F.3d at 1367.

■■■ Another conceptual limitation placed on the doctrine of equivalents is that the patentee is not permitted to use the doctrine to recover subject matter the patentee surrendered during the patent process. *K–2 Corp.,* 191 F.3d at 1367; *Southwall Technologies, Inc.,* 54 F.3d at 1578. "Prosecution history estoppel" will exclude from the doctrine of equivalents any subject matter the patentee, either by argument or amendment, relinquished during the patent prosecution. *Warner–Jenkinson Co.,* 520 U.S. at 30–31, 117 S.Ct. 1040; *K–2 Corp.,* 191 F.3d at 1367. Where the patentee makes arguments and amendments to avoid prior art or to address a particular concern of the examiner that would have made the claimed subject matter unpatentable, the patentee will be estopped from disavowing the position taken before the patent examiner in later pursuing a claim of infringement against another based on the doctrine of equivalents. *Warner–Jenkinson Co.,* 520 U.S. at 30–33, 117 S.Ct. 1040.

■■■ The burden is on the patentee to establish the reason for an amendment required during patent prosecution. *Id.* at 33, 117 S.Ct. 1040. The court then decides, as a matter of law, whether that reason is sufficient to overcome prosecution history estoppel as a bar to application of the doctrine of equivalents to the element at issue. *Id.; K–2 Corp.,* 191 F.3d at 1369. Where the patentee fails to provide a reason, the court presumes the patentee had a substantial reason related to patentability. *Warner–Jenkinson Co.,* 520 U.S. at 33, 117 S.Ct. 1040. Summary judgment may be granted if prosecution history estoppel applies. *Id.* at 39 n. 8, 117 S.Ct. 1040.

■■■ As noted above, Plaintiff expressly distinguished its invention from the prior art, the Zafirogou '297 patent, on the ground that the Zafirogou patent disclosed "a compress that is made from an elastic fabric and comprises a hydrogel-forming polymeric material. The absorbent polymer filler material may be particulate, and may be accompanied by a diluent filling material." (Docket Entry No. 46 at 245). The Zafirogou patent specification expressly stated that "the diluent may include synthetic textile fibers, wood pulp fibers, cotton linters, and mixtures of fibers. . . . A preferred diluent is a mixture of wood pulp and polyethylene synthetic pulp[.]" (Docket Entry No. 53, Tab A at 3, column 4.) Plaintiff also contended Zafirogou failed to "disclose or suggest fiberfill batting and polymeric fibers and/or particles of the composite material in the claimed method." (Docket Entry No. 46 at 245.) Through argument to obtain the patent and its amendments to the '977 patent, Plaintiff relinquished any claim that its use of fiberfill in the water-absorbent layer comprised wood pulp or a mixture of synthetic and natural fibers. Based on Plaintiff's own response, the patent examiner withdrew the rejection and allowed the '977 patent.

Accordingly, the Court concludes that Plaintiff is barred by prosecution history estoppel from taking the position against Defendant that use of Vizorb®, containing natural wood pulp and synthetic fibers, contributorily infringes the '977 patent by virtue of the doctrine of equivalents. *See Warner–Jenkinson Co.,* 520 U.S. at 30–33, 117 S.Ct. 1040; *K–2 Corp.,* 191 F.3d at 1369. Defendant is entitled to summary judgment, and Plaintiff's cross-motion for partial summary judgment must be denied.

### V. *MOTION FOR SANCTIONS*

Plaintiff moves for sanctions against Defendant under the inherent power of

the Court and Rule 56(g). Plaintiff contends: (1) Defendant falsely claimed the absorptive layer of its fabric contained no synthetic fiber; (2) Defendant's Chief Executive Officer, Doug Frost, drafted the contents of a letter allegedly written by Dr. Anne Grosvenor of Buckeye Technologies supporting Defendant's position in this case; (3) Frost falsely denied he ever requested information from Plaintiff about its products; and (4) Defendant misrepresented the true opinion of its expert, Dr. Subhash Batra, by falsely omitting critical information from Dr. Batra's affidavit.

Having carefully reviewed the allegations of the motion in light of the record, the Court discerns no egregious misconduct warranting the imposition of sanctions against Defendant, under the inherent power of the Court or Rule 56(g). *See Chambers v. NASCO,* 501 U.S. 32, 45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (inherent power); *First Bank of Marietta v. Hartford Underwriters Ins. Co.,* 307 F.3d 501, 510 (6th Cir.2002) (same); *Jaisan, Inc. v. Sullivan,* 178 F.R.D. 412, (S.D.N.Y.1998) (Rule 56(g)). In the Court's view, Defendant did not falsely misrepresent any matter to the Court, nor did Defendant improperly "manufacture" evidence. As counsel well know, it is not uncommon in civil litigation for parties themselves to draft documents with limited legal supervision to minimize expense. Often, parties determine certain scientific tests and expert assistance are beyond their financial means, as Defendant determined with regard to certain tests Dr. Batra offered to conduct. Plaintiff deposed Defendant's witnesses, investigated any concerns it had regarding the facts, and presented its own view of the evidence to the Court. This is the essence of civil litigation, and the Court believes Defendant vigorously defended the suit brought against it, just as Plaintiff vigorously prosecuted it.

The Court did not rely, moreover, on the expert opinion testimony of Dr. Batra or the lay testimony of Buckeye's salesperson, Dr. Grosvenor, to decide the case; therefore, Plaintiff has not been prejudiced by such testimony. *See Faberge, Inc. v. Saxony Prods., Inc.,* 605 F.2d 426, 429 (9th Cir.1979) (cited in *Sutton v. United States Small Business Admin.,* 92 Fed.Appx. 112, 118 (6th Cir.2003 (unpublished))). Plaintiff's Motion for Sanctions will be denied.

## VI. REQUEST FOR ATTORNEY'S FEES

The Court finds this is not an "exceptional" case warranting an award of attorney's fees to the prevailing party under 35 U.S.C. § 285. *See Dow Chemical Co. v. Exxon Corp.,* 139 F.3d 1470, 1479 (Fed.Cir. 1998). While this is a close case, there is not clear and convincing evidence that the case is "exceptional" as contemplated by the statute and the case law. *Cf. Interspiro USA, Inc. v. Figgie Int'l, Inc.,* 18 F.3d 927, 933–934 (Fed.Cir.1994). Additionally, the Court finds neither party litigated unfairly, vexatiously, or in bad faith, and thus, an award of attorney's fees is not necessary to prevent "gross injustice." *See Sun–Tek Indus., Inc. v. Kennedy Sky Lites, Inc.,* 929 F.2d 676, 679 (Fed.Cir. 1991). Therefore, each side will bear its own attorney's fees and expenses.

## VII. CONCLUSION

For the foregoing reasons,

(1) Defendant's Motion for Summary Judgment (Docket Entry No. 43) will be GRANTED and it's request for attorney's fees, as the prevailing party under 35 U.S.C. § 285 (*see* Docket Entry No. 17), will be DENIED;

(2) Plaintiff's Cross–Motion For Partial Summary Judgment Re Patent Infringement Liability (Docket Entry No. 47) will be DENIED; and

(3) Plaintiff's Motion for Sanctions (Docket Entry No. 50) will be DENIED.

An appropriate Order will be entered.

## ORDER

For the reasons explained herein and in the Memorandum entered herewith, the Court rules as follows:

1. The Court has determined oral argument is not needed to resolve the issues presented by the pending motions and Plaintiff's Request for Oral Argument (Docket Entry No. 40) is hereby DENIED;

2. Defendant's Motion for Summary Judgment (Docket Entry No. 43) is hereby GRANTED; however, its request for attorney's fees pursuant to 35 U.S.C. § 285 (*see* Answer; Docket Entry No. 17) is hereby DENIED;

3. Plaintiff's Cross–Motion For Partial Summary Judgment Re Patent Infringement Liability (Docket Entry No. 47) is hereby DENIED; and

4. Plaintiff's Motion for Sanctions (Docket Entry No. 50) is hereby DENIED.

This case is hereby DISMISSED WITH PREJUDICE.

It is so ORDERED.